# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NCP US TERMINALS LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-1338-KSJM |
| | ) | |
| ODFJELL TERMINALS US HOLDINGS, LLC, ODFJELL TERMINALS B.V., ODFJELL TERMINALS US HOLDINGS AS, and ODFJELL TERMINALS AMERICAS LLC, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted:  April 20, 2026
Date Decided:  August 6, 2026

Raymond J. DiCamillo, Brock E. Czeschin, Nicole M. Henry, Kaitlyn R. Zavatsky, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Richard K. Welsh, David Pernas, ALPHA TRIAL GROUP, LLP, Los Angeles, California; *Counsel for Plaintiff NCP US Terminals LP.*

Martin S. Lessner, Andrew J. Czerkawski, Liam C. Reeves, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michael C. Keats, Rebecca L. Martin, Anne S. Aufhauser, Harrison D. Polans, Michael Yoon, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, New York, New York; *Counsel for Defendants Odfjell Terminals US Holdings, LLC, Odfjell Terminals B.V., Odfjell Terminals US Holdings AS, and Odfjell Terminals Americas LLC.*

**McCORMICK, C.**

The parties are members of Odfjell Terminals US Holdings LLC ("OTUS" or the "Company"), a Norwegian shipping company. The private equity plaintiff owns 49% of the Company. The defendants own 51% of the Company and operate it. The plaintiff would like to maximize the value of its investment through distributions or a sale of its interests, and the defendants would like to buy out the plaintiff. But the parties are far apart on price, and they have used their respective contractual and governance rights under the Company's LLC agreement as bargaining chips in the larger buyout discussion. The plaintiff refused to amend or extend the existing debt facility that was set to expire months after the parties' dispute escalated. And the defendants refused to approve distributions.

The plaintiff filed this suit claiming that the defendants breached express and implied terms of the LLC agreement by refusing distributions thereby triggering plaintiff's call rights under that agreement. Alternatively, the plaintiff requested judicial dissolution based on board deadlock. The defendants filed a separate suit, later consolidated with this action, seeking the appointment of a limited-purpose custodian to resolve the debt crisis.

At the court's urging, the parties consented to the appointment of a limited-purpose custodian to work through the debt crisis. The parties then went to trial on the plaintiff's claims of breach of the LLC agreement and judicial dissolution.

The plaintiff failed to prove its claim of breach of the LLC Agreement. At bottom, the plaintiff asks the court to enforce a contractual right for which they never bargained—the right to require the defendants to act in *the plaintiff's* best interests

when determining whether to approve distributions. The plaintiff's claim for judicial dissolution similarly fails. The board's deadlock over leveraged distributions, distributions to which the plaintiff is not entitled, does not qualify as the sort of existential issue warranting judicial dissolution. This post-trial decision enters judgment for the defendants.

## I. FACTUAL BACKGROUND

Trial took four days. The record comprises 351 trial exhibits, live testimony from six fact witnesses, deposition testimony from 12 fact witnesses, and 70 stipulations of fact.[1] These are the facts as the court finds them after trial.

### A. Northleaf Acquires A Stake In OTUS.

Plaintiff NCP US Terminals LP is an investment vehicle owned by private equity funds managed by Northleaf Capital Partners Ltd. and its affiliates ("Northleaf").[2] Northleaf invests in infrastructure and generally holds its

---

[1] This decision cites to: C.A. No. 2024-1338-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX-" number); the trial transcript, Dkts. 202–05 ("Trial Tr."); supplemental submissions, Dkt. 253; and stipulated facts set forth in the Parties' Stipulation and Pre-Trial Order, Dkt. 186 ("PTO"). The parties called the following fact witnesses: John Blanchard (Odfjell Terminals U.S., CEO), Terje Iversen (Odfjell SE, CFO), Adrian Lenning (Odfjell SE, Managing Director of Terminals), Kaushik Ramakrishnan (a/k/a Kash Ramki) (Northleaf Capital, Executive Operating Partner), Jamie Storrow (Northleaf Capital, Co-Head of Infrastructure), and Morris White (Odfjell Terminals U.S., CFO). The parties submitted the deposition transcripts of the witnesses called at trial and called the following witnesses by deposition only: Carmine Falcone (Odfjell Terminals U.S., Board Member), Harald Fotland (Odfjell SE, CEO), Rosalee Hermens (Odfjell Terminals U.S., Board Member), Stian Ommedal (Odfjell SE, Manager of Business Analytics), Arild Viste (Odfjell Terminals U.S., Board Member), and Jared Waldron (Northleaf Capital, Co-Head of Infrastructure). The transcripts of the witnesses' respective depositions are cited using the witnesses' last names and "Dep. Tr."

[2] JX-24 ("LLC Agreement") at 6; Trial Tr. at 283:15–18 (Ramki).

2

investments for seven to eight years.[3]  To generate returns, the firm targets investments that both appreciate and generate cash through distributions.[4]

In 2019, Northleaf acquired a 49% membership interest in the Company for $115.5 million.[5]  OTUS owns and operates two liquid bulk storage terminals located in Houston, Texas and Charleston, South Carolina.[6]  Northleaf expected to hold its OTUS interest for about seven years.[7]  So Northleaf is near the end of its expected investment horizon in OTUS.[8]

Defendant Odfjell Terminals B.V. ("OTBV") held the remaining 51% interest in OTUS.[9]  OTBV is a subsidiary of non-party Odfjell SE,[10] a publicly traded Norwegian chemical shipping and terminal group.[11]  OTBV later transferred its interest to another Odfjell SE subsidiary, Odfjell Terminals US Holdings AS ("OTAS").[12]  In turn, OTAS transferred the 51% OTUS interest to Odfjell Terminals Americas LLC (together with OTUS, OTBV, and OTAS, "Odfjell" or "Defendants").[13]

---

[3] Trial Tr. at 1015:15–1016:14 (Storrow).

[4] *Id.* at 1016:4–19 (Storrow).

[5] PTO ¶¶ 25–26.

[6] *Id.* ¶ 24.

[7] Trial Tr. at 465:23–466:8 (Ramki).

[8] *See id.*

[9] PTO ¶ 27.

[10] *Id.*

[11] Trial Tr. at 670:1–10 (Lenning).

[12] PTO ¶ 28.

[13] *Id.*

Odfjell  is the operating partner of OTUS under a master services agreement.[14] Odfjell supports and oversees operations related to safety, engineering, audits, IT support, and marketing.[15]

**B.     The Parties Enter An LLC Agreement.**

At the time of its investment, Northleaf entered into a Limited Liability Company Agreement (the "LLC Agreement") with OTBV.[16]  Northleaf and Odfjell Terminals Americas are the Company's sole "Members."[17]

Under the LLC Agreement, six managers govern OTUS (the "Board").[18] During all relevant periods, the Board comprised Terje Iversen, Adrian Lenning, and Arild Viste for Odfjell and Kash Ramki, Carmine Falcone, and Rosalee Hermens for Northleaf.[19]

Each year, the Board approves a budget under Section 7.2 of the LLC Agreement.[20]  The Board also decides whether the Company has "Available Cash" to make distributions under Section 5.1(a) of the LLC Agreement.[21]   And Board decisions bind the Members under Section 6.1(c) of the LLC Agreement.[22]

---

[14] LLC Agreement § 6.12.

[15] Trial Tr. at 674:21–675:10 (Lenning).

[16] PTO ¶ 1; LLC Agreement.

[17] PTO ¶¶ 1, 27–28.

[18] *Id.* ¶ 31; LLC Agreement § 6.3(a).

[19] PTO ¶¶ 31–42.

[20] Trial Tr. at 338:5–6 (Ramki); LLC Agreement § 7.2; *see also id.* § 6.7(g) (requiring unanimous consent).

[21] LLC Agreement § 5.1(a).

[22] *Id.* § 6.1(c).

4

## C. OTUS Refinances And Improves Its Operations.

Kash Ramki is an executive operating partner at Northleaf.[23]   He led Northleaf's diligence of OTUS in 2019 and is Northleaf's lead Board representative.[24] Northleaf invested in the Company expecting quarterly distributions.[25]   But according to Ramki, "[s]oon after [Northleaf] acquired [its] interest, [it] learned that the business was . . . underinvested in for many years."[26]  The Company had deferred significant maintenance and capital expenditures.[27]   John Blanchard, the CEO of OTUS since May 2019, acknowledged that the Company "was in pretty poor shape."[28] Given OTUS's condition, the Board deferred distributions.[29]   And both Members agreed that earnings should be reinvested.[30]

To turn around the Company, the Board needed to secure a new credit facility to fund capital expenditures.[31]  To do so, the Board first had to approve a financing option, which is typically done through the annual budgeting process.[32]  Management could then go to the market to procure the executable terms.[33]

---

[23] Trial Tr. at 461:7–10 (Ramki).

[24] *Id.* at 283:19–22, 285:20–24 (Ramki).

[25] *Id.* at 1007:9–12 (Iversen).

[26] *Id.* at 287:14–16 (Ramki).

[27] *Id.* at 287:20–23 (Ramki).

[28] *Id.* at 8:16–18 (Blanchard); PTO ¶ 32.

[29] Trial Tr. at 64:20–65:2 (Blanchard).

[30] *Id.* at 291:2–7 (Ramki); *id.* at 24:3–23 (Blanchard).

[31] *Id.* at 64:16–65:2, 66:1–10 (Blanchard).

[32] *Id.* at 289:21–290:18 (Ramki).

[33] *Id.*

The Board considered a new credit facility at a meeting on November 19, 2019.[34] At the meeting, the Board approved the 2020 budget for OTUS.[35] Separately, the Board instructed management to seek a bank-led revolving credit facility.[36]

Management went to the market with those instructions. Morris White, the CFO of OTUS since 2019, negotiated with lenders.[37] During negotiations, OTUS learned that lenders opposed distributions.[38] Because negotiations occurred during the onset of the COVID-19 pandemic when the credit market had constricted,[39] OTUS had to accept "whatever [the lenders] gave [them] at that point in time."[40] As a result, the terms of the credit facility limited OTUS's ability to make distributions.[41]

The Board executed a written consent to approve the final terms of the credit agreement on March 16, 2020.[42] White then executed the credit agreement on March 18, 2020.[43]

Over the next several years, OTUS spent over $250 million making capital expenditures to grow the business.[44] One of Odfjell's most valuable assets was a

---

[34] Trial Tr. at 200:15–201:16 (White); JX-43 at 2, 6–7.

[35] JX-43 at 6; Trial Tr. at 201:1–7 (White).

[36] JX-43 at 7.

[37] Trial Tr. at 153:6–20, 212:2–18 (White); JX-47 at 1.

[38] *Id.* at 291:14–21 (Ramki).

[39] *Id.* at 291:22–292:6 (Ramki); *see* JX-54.

[40] *Id.*

[41] *Id.* at 13:8–13 (Blanchard); *id.* at 291:18–21 (Ramki); *id.* at 1008:7–14 (Iversen).

[42] JX-53; *see also* Trial Tr. at 217:12–219:1 (White); JX-45.

[43] JX-54 at 1, 127; *see also* Trial Tr. at 77:16–78:24 (Blanchard).

[44] Trial Tr. at 214:15–20 (White).

Houston-based terminal constructed in 1982 under the leadership of Dan Odfjell, the father of the Company's current chairman.[45] OTUS spent $9.9 million in 2020 and 2021 to upgrade the Houston terminal's hydraulic power unit.[46] The Board also approved spending $60.6 million on the expansion of the Houston terminal.[47] OTUS's capital allocation paid off—its investments nearly doubled EBITDA.[48]

### D. Odfjell Launches Project Clemens.

As the Company's finances improved, Odfjell contemplated buying out Northleaf's interest. Adrian Lenning, Odfjell SE's Managing Director for Terminals,[49] approached Ramki about acquiring Northleaf's OTUS stake in June 2023.[50] The approach was informal—Lenning had not broached the topic with his superiors.[51] According to Lenning, Ramki gave a lukewarm response as Northleaf was not contemplating an exit, but they always considered inbound interest.[52] Lenning, however, gleaned from the conversation that Odfjell could submit an offer to Northleaf without offending them.[53]

---

[45] *Id.* at 670:12–19, 673:7–15, 674:5–18 (Lenning) (testifying that the terminal is Odfjell SE's "single most valuable and unique asset" because of its technological capabilities and location at the beginning of one of the world's largest chemical shipping channels).

[46] JX-1071 at 7–9; Trial Tr. at 220:19–221:3 (White); *id.* at 79:24–80:22 (Blanchard).

[47] JX-1042 at 34–35; Trial Tr. at 82:24–84:12 (Blanchard).

[48] Trial Tr. at 465:14–22 (Ramki).

[49] PTO ¶ 36.

[50] Trial Tr. at 690:7–19 (Lenning).

[51] *Id.* at 690:22–691:6 (Lenning).

[52] *Id.* at 691:7–14 (Lenning).

[53] *Id.*

Based on the preliminary conversation, Lenning initiated "Project Clemens" to acquire Northleaf's OTUS stake.[54] On August 14, 2023, Lenning sent a Project Clemens presentation to Harald Fotland, the CEO of Odfjell SE, and Terje Iversen, the CFO of Odfjell SE.[55]

The presentation explained Odfjell's rationale behind an acquisition.[56] Odfjell believed that Northleaf was likely to seek to exit its investment in OTUS as early as 2024.[57] Other pressures made Odfjell believe that Northleaf would consider an acquisition, including the current challenging fundraising environment.[58] By acquiring Northleaf's stake, Odfjell avoided the possibility of Northleaf selling to an incompatible business partner and also created additional merger opportunities.[59] Odfjell further saw "a strong rationale . . . to *pre-empt* a competitive process"—an auction of Northleaf's stake.[60] After the presentation, Fotland and Iversen blessed Lenning's further outreach to Ramki.[61]

---

[54] *Id.* at 691:17–22, 703:2–8 (Lenning). Lenning named the project after legendary baseball player, Roger Clemens, who played for the Toronto Blue Jays (where Northleaf is headquartered) and found further success with the Houston Astros (where OTUS's Houston terminal is located). Lenning Dep. Tr. at 19:7–19.

[55] *Id.* at 691:17–22 (Lenning); JX-128; PTO ¶¶ 34–35.

[56] *See* JX-128.

[57] *Id.* at 3.

[58] *Id.* at 3, 5.

[59] *Id.* at 6.

[60] *Id.* at 3 (emphasis in original).

[61] Trial Tr. at 691:19–692:9 (Lenning).

In August 2023, Lenning again broached a potential buyout with Ramki.[62] Ramki discussed the issue with his superior, Jamie Storrow, Northleaf's Co-Head of Infrastructure.[63] Ramki emailed Lenning that he "started an internal discussion with Jamie and as you would expect, the notion of selling without running a competitive process is a steep uphill battle."[64]

In September 2023, Lenning presented Project Clemens to the full Odfjell SE board.[65] The presentation shared the same strategic rationales as those shared with Fotland and Iversen.[66] Lenning also recommended submitting an offer in 2023 because a "competitive process will likely push the price to levels where Odfjell cannot compete."[67] The Odfjell SE board approved Project Clemens, allowing Odfjell to approach Northleaf with a non-binding offer.[68]

On October 27, 2023, Odfjell offered Northleaf $204 million for their OTUS stake.[69] Northleaf rejected the offer.[70] Ramki told Lenning that the offer "was woefully low."[71] Lenning's notes on the exchange state: "[Northleaf] feel[s] our price

---

[62] *Id.* at 692:6–11 (Lenning).

[63] *See id.* at 693:2–4 (Lenning); PTO ¶ 40.

[64] JX-134 at 2.

[65] JX-749 at 1, 103; Trial Tr. at 705:6–20 (Lenning).

[66] *See* JX-749 at 103, 105.

[67] *Id.* at 107.

[68] Trial Tr. at 711:11–19 (Lenning).

[69] *Id.* at 302:23–303:15 (Ramki); *id.* at 711:11–19 (Lenning); JX-172 at 2.

[70] JX-173; Trial Tr. at 1029:19–1030:1 (Storrow).

[71] Trial Tr. at 305:17–23 (Ramki).

(USD 417 mln for 100%) undervalues (i) the growth potential of the business, (ii) the value from relevering and (iii) the control premium[.]"[72]

### E. The Board Approves The 2024 Budget.

Meanwhile, business continued. Consistent with the LLC Agreement, the OTUS Board approves a budget annually.[73] The budget "guides how [OTUS] allocate[s] capital to meet the [C]ompany's growth initiatives, as well as [] finance operations."[74] CFO White and his team take months to prepare the annual budget for Board approval.[75]

Producing a budget follows a set procedure each year.[76] Beginning in May, White and his team start preparing a budget.[77] Next, the Board's budget subcommittee vets their work.[78] In 2023, both Ramki and Lenning sat on the OTUS budget subcommittee.[79] Last, the budget goes to the full Board for approval.[80]

Management presented the 2024 budget to the Board at a November 2023 Board meeting.[81] For the meeting, management prepared materials and an agenda

---

[72] JX-195 at 6.

[73] Trial Tr. at 338:5–6 (Ramki); LLC Agreement § 7.2.

[74] Trial Tr. at 155:8–18 (White).

[75] *Id.*

[76] *See id.* at 155:21–156:23 (White).

[77] *Id.* at 155:21–24 (White).

[78] *Id.* at 156:1–6 (White).

[79] *Id.* at 156:9–12 (White).

[80] Trial Tr. at 338:5–6 (Ramki); LLC Agreement § 7.2.

[81] JX-189 at 3, 22–30.

to guide the Board's discussion.[82]   The agenda listed the "2024 budget" as an "approval" item, indicating that management would seek approval of the 2024 budget at the meeting.[83]  The Board minutes show that the Board "[a]pproved downside case one," a scenario that used lowered EBITDA.[84]  Because the budget prepared for the meeting did not reflect that set of assumptions, the Board directed management to prepare an updated budget presentation reflecting "downside case one" before it formally approved the budget.[85]

The Board materials and minutes also cover a proposed refinancing.[86]  The minutes indicate that before the meeting, the Board "requested [an] update on the refinanc[ing] process after vetting with the Board working group."[87]  The agenda listed the refinancing as an informational update.[88]

In management's presentation, a slide titled "Debt Refinancing / Credit Facility Covenant Redesign" gives a detailed update on management's progress towards a refinancing.[89]  The situational overview section states that management "conducted a debt product overview for the Board working group" and "the working

---

[82] *See id.*

[83] *Id.* at 8; Trial Tr. at 716:5–717:6 (Lenning); *id.* at 223:8–19 (White).

[84] JX-189 at 3.

[85] Trial Tr. at 721:14–19 (Lenning).

[86] *See* JX-189 at 1, 3, 8, 39, 43.

[87] *Id.* at 1.

[88] *Id.* at 8.

[89] *Id.* at 39.

11

group agreed to a limited market test for a potential [term loan] solution."[90] The slide shows four objectives: (1) "[c]onsummation of refinancing by end of Q1 2024"; (2) secure an approximately *"$350 [million] [f]ive [year] tranche credit facility"*; (3) "[l]everaged distribution upon transaction close"; and, (4) "[c]ovenant redesign."[91]

At trial, witnesses disagreed on whether the Board discussed a $350 million refinancing and leveraged distributions during the meeting. Blanchard testified that the Board reviewed the refinancing slide.[92] Ramki agreed.[93] But Lenning testified that the Board did not.[94]

The preponderance of the evidence, however, indicates that the Board in fact discussed a $350 million refinancing during the meeting. Beyond Blanchard's and Ramki's testimony, the Board meeting minutes reflect that Iversen sought additional information about OTUS's "liquidity forecast based on the final budget, including the impact of refinancing."[95] In his testimony, Lenning conceded that management could not provide a "liquidity forecast" without knowing the refinancing numbers.[96] Moreover, the refinancing slide showing the $350 million figure is the only one in the

---

[90] *Id.*

[91] *Id.* (emphasis added).

[92] Trial Tr. at 17:2–7, 19:10–22:9 (Blanchard).

[93] *Id.* at 316:22–24 (Ramki).

[94] *Id.* at 848:2–10 (Lenning).

[95] JX-189 at 3.

[96] Trial Tr. at 846:9–847:16 (Lenning).

12

presentation's refinancing update section.[97]  It is unlikely that the Board skipped an entire section.  The meeting was not rushed.  It lasted two days.

Given the testimony and circumstances, the court finds that the Board considered the $350 million refinancing at the meeting.  But there is no evidence that the Board approved it during the meeting.  At most, the Board gave management approval to seek terms for a financing.

At Lenning's request, White circulated a written consent for Board approval of the 2024 budget and a separate deck entitled "2024 Budget Presentation" on December 12, 2023.[98]  The Board approved the written consent (the "Written Consent").  The Written Consent gave management the green light to secure prospective terms for a $350 million refinancing.[99]

Five of the six Board members executed the Written Consent by DocuSign.[100] The sixth manager—Odfjell's Arild Viste—had difficulty with DocuSign.[101]  Viste signed the consent at the next Board meeting in February 2024.[102]  Later, Odfjell questioned whether the Board fully executed the Written Consent.[103]  When shown

---

[97] JX-189 at 38–40.

[98] JX-208; JX-213.

[99] Trial Tr. at 19:10–17, 29:18–30:3, 52:11–18 (Blanchard); *id.* at 172:5–13 (White).

[100] JX-266; Trial Tr. at 173:16–174:18 (White).

[101] Trial Tr. at 174:2–10 (White); JX-264.

[102] Trial Tr. at 174:10–15 (White); JX-266.

[103] JX-453 at 2.

13

the documentation, however, Lenning agreed that the Board executed the 2024 Budget.[104]

### F. Management Pursues A Refinancing.

Although the December 2023 written consent authorized management to secure terms of a $350 million refinancing, both management and the Board understood that OTUS could not enter into a credit agreement without the Board's final approval.[105]

Still, management believed a refinancing would happen in 2024.[106] As White explained, management believed that Northleaf and Odfjell agreed to seek a $350 million refinancing and a subsequent distribution in 2024.[107] And Blanchard's bonus depended on securing the refinancing—the Board made the refinancing one of his top objectives and part of his performance "scorecard."[108]

After the November Board meeting, therefore, OTUS management began contacting "banks about that $350 million structure[.]"[109] But the refinancing would never happen.

---

[104] Lenning Dep. Tr. at 92:9–15.

[105] Trial Tr. at 289:24–290:23 (Ramki); *id.* at 210:7–11 (White); *id.* at 34:1–24 (Blanchard).

[106] *Id.* at 168:18–23 (White); *id.* at 34:17–24 (Blanchard).

[107] *Id.* at 168:6–23 (White).

[108] *Id.* at 35:6–13, 36:5–9, 37:7–18 (Blanchard); JX-625.

[109] Trial Tr. at 29:18–24 (Blanchard).

### G. Tax Issues Come To Light.

A few months after Odfjell initiated buyout discussions with Northleaf, Odfjell became aware of tax issues with Odfjell SE's distributions to its wholly owned subsidiary, OTBV.[110]

Tax complications were not new to Odfjell.[111] As early as 2021, Ernst & Young evaluated the "tax implications of making distributions" from OTUS to the Members.[112] That year, Odfjell SE discovered two tax issues related to the structure of OTBV and distributions.[113] First, Odfjell learned that distributions to OTBV, the prior Odfjell SE member of OTUS, would incur a 30% withholding tax, not 5%.[114] Second, a sale of OTBV's 51% membership interest in OTUS would likely trigger a 21% capital gains tax under the Foreign Investment in Real Property Tax Act ("FIRPTA"), resulting in $40 to 50 million in tax liability.[115] In November 2022, Odfjell SE developed a restructuring plan to minimize taxes incurred in connection with distributions or a sale of OTUS.[116]

---

[110] *Id.* at 727:15–728:1, 882:9–11 (Lenning); JX-234.

[111] *See* JX-77 at 6.

[112] *Id.*

[113] JX-670 at 4.

[114] JX-1004 at 1.

[115] JX-670 at 4–5; JX-1004 at 1.

[116] JX-99 at 2; JX-670 at 6. The plan involved "establishing a Norwegian terminal holding company and transferring that holding company to OTBV, which would then contribute its OTUS interest to the Norwegian holding company, which would then contribute the OTUS interest to another newly formed Norwegian subsidiary[.]" JX-670 at 5. The restructuring would reduce FIRPTA tax liability triggered by a sale and subject distributions to a 15% withholding rate, not 30%. *Id.*

The restructuring created a new problem.[117]  Sometime in late 2023, Odfjell learned that any OTUS distribution during the restructuring would destroy the restructuring's cleansing of FIRPTA tax liability.[118]

The legal concerns posed real problems for Odfjell, but they also created an opportunity, as Lenning recognized.  Lenning offered "an extra ginger cookie" to anyone who could identify how Odfjell could use the issue to their advantage.[119]  One employee suggested using the issue to create timing pressure in negotiations with Northleaf.[120]  The employee suggested giving Northleaf an "ultimatum" to "stir things up and potentially accelerate their decision making—hopefully in [Odfjell's] favor."[121]

In January 2024, Lenning contacted Ramki to explain Odfjell's concerns with distributions.  He followed up with an email on January 21, 2024.[122]  In the email, Lenning explained the current situation, stating that "we understand that distributions to OTBV would be taxed at a highly punitive rate of 30%.  That would obviously be a show-stopper with respect to receiving dividends from OTUS."[123]  The restructuring would halve the withholding tax rate, placing it "at a level where

---

[117] JX-670 at 6.

[118] *Id.* at 5–6; Dkt. 253, Ex. 1 at OTBV_00045471–73 ("We learnt early that it's important that OTUS does not distribute any dividends in the three years preceding the restructuring as that would trigger US inversion rules. We recently learned that this also applies to a dividend distribution evenly to both owners based on ownership percentage (as no such dividend has been regularly paid).").

[119] Dkt. 253, Ex. 1 at OTBV_00045471.

[120] *Id.* at OTBV_00045473.

[121] *Id.*

[122] JX-232.

[123] *Id.* at 1.

[Odfjell is] able to be collaborative when it comes to distributions."[124]  Plus, it would eliminate the $40 to 50 million capital gains overhang provided Odfjell did not sell its OTUS stake within 12 months of the restructuring.[125]

Moreover, a 2024 distribution could trigger U.S. inversion tax rules that disregard the restructuring (the "Inversion Tax Issue").[126] To avoid that, Odfjell SE would have to wait 36 months after a distribution before executing a restructuring.[127] And a 12-month standstill period would apply after that.[128]  A distribution would thus prompt events that would "rule Odfjell out as a potential acquirer of Northleaf's stake in OTUS during this period, as it introduces a USD 40-45 [million] tax risk."[129] Lenning concluded that "[c]andidly that is not a position which Odfjell would like to put itself in" and that the tax issue is "something that we need to resolve before we can approve a distribution by OTUS."[130]

Lenning's tax advice was not certain.  The analysis hinged on whether U.S. tax authorities would view the restructuring as "related to" Project Clemens or a distribution.[131]  Odfjell's tax advisor recommended waiting on Project Clemens and a

---

[124] *Id.*

[125] *Id.* at 1–2.

[126] *Id.* at 2.

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] Dkt. 253, Ex. 6 at OTBV_00045333.

distribution so the U.S. viewed the transactions as unrelated.[132] The restructuring would reduce Odfjell's tax overhang provided that Odfjell did not condition either transaction on the restructuring.[133]

Northleaf engaged its own tax advisor, Leo Burwick, to consider the Inversion Tax Issue.[134] Through February and March 2024, the firm met with Odfjell and their tax advisor, Fried Frank.[135] The firms disagreed on the gravity of the Inversion Tax Issue.[136] Based on advice from Leo Burwick, Northleaf came to believe that the Inversion Tax Issue was "either curable or fictional."[137]

## H. Odfjell Applies "Gentle Force."

Meanwhile, Odfjell continued to pursue Northleaf's stake in OTUS.[138] Lenning revisited Odfjell's initial $204 million offer with Ramki in November and December of 2023.[139] Northleaf maintained that the $204 million offer was "far too low."[140] In

---

[132] *Id.*

[133] *Id.* ("For example, the decision to pay the dividend should be made after the drop down, and it should be demonstrated that the dividend was not contingent on the drop down occurring, and the drop down was not contingent on the subsequent dividend being paid. Likewise, negotiations relating to Clemens should begin after the drop down, and it should be demonstrated that Clemens was not contingent on the drop down occurring, and the drop down was not contingent on the subsequent Clemens transaction.").

[134] Trial Tr. at 1028:20–22 (Storrow); JX-757.

[135] Trial Tr. at 345:4–7 (Ramki).

[136] *Id.* at 344:10–16 (Ramki).

[137] *Id.*

[138] JX-195 at 3; JX-203 at 1.

[139] *Id.*

[140] JX-754 at 2.

a January 2024 email to Fotland, Lenning stated that Northleaf compared the offer to a refinancing and dividend in 2024 followed by a sale in late 2024 or early 2025.[141] Lenning also stated that the "LLC Agreement provides Odfjell with substantial influence over a potential [Northleaf] sale process" due to Odfjell's right of first refusal, tag-along rights, and disqualified buyers clause.[142]

In 2024, Odfjell gently dialed up the pressure. Lenning shared a Project Clemens presentation—dated February 7, 2024 and only a few weeks after Lenning's email to Ramki—with Fotland and Odfjell SE's board.[143] The presentation focused on Project Clemens' positioning in connection with a restructuring and distributions.[144]

The presentation first acknowledged the planned refinancing, stating that "Odfjell and Northleaf were jointly pursuing a refinancing of OTUS to allow for dividend distributions in 1 H24."[145] It further stated that "certain tax considerations relating to the envisaged restructuring . . . may cause Odfjell to change its stance on near-term distributions from OTUS."[146] From there, a decision tree explains that Odfjell's "stance on distributions boils down to what we intend for Clemens and for the terminal portfolio in the near and medium term[.]"[147] If Odfjell pursues an

---

[141] *Id.* at 2–3.

[142] *Id.* at 3.

[143] Trial Tr. at 898:19–899:8 (Lenning).

[144] *See* JX-755.

[145] *Id.* at 2.

[146] *Id.* at 3.

[147] *Id.* at 4.

acquisition, the presentation recommends executing a transaction before a distribution and using "dividends/inversion as [a] 'bargaining chip.'"[148] The next slide reinforced the recommendation.[149] Executing Clemens meant "hold[ing] back on distributions" and using "inversion issue and dividends as [a] 'bargaining chip.'"[150]

The presentation recognized that Odfjell's "right to 'block' dividends in OTUS may be challenged" and "Northleaf could 'strong arm' a distribution, which would likely put Odfjell at a disadvantaged position with respect to potential tax leakage, as well as capital gain tax exposure (FIRPTA) and/or potentially acquiring OTUS in the near/medium term[.]"[151]

Ultimately, Lenning believed that "using 'gentle force'" could lead to a transaction in the $215 and $225 million range.[152]

Timing was critical. Odfjell knew their "best chance [was] to provoke/simulate a transaction now rather than to wait for Northleaf to run a sale process."[153] Preempting an auction allowed Odfjell to bring Northleaf down to a price range where it could compete.[154]

---

[148] *Id.* Odfjell uses the terms "dividends" and "distributions" interchangeably in its communications.

[149] *See id.* at 5.

[150] *Id.*

[151] *Id.* at 6.

[152] *Id.* at 7.

[153] *Id.*

[154] *See id.*

20

The presentation did not mention excessive leverage as a factor to consider for OTUS distributions.[155]  But an email exchange between Lenning and Laurence Odfjell did.[156]  Responding to Laurence Odfjell's inquiry on a high-leverage refinancing, Lenning stated, "we from day 1 have pushed back on both leverage and structure" and  "less dividends should obviously also make Clemens a more attractive alternative for Northleaf."[157]

Then, in a prescient analysis, Lenning explained why he believed failing to execute on Project Clemens and holding back on distributions would result in a "lose-lose scenario":

> If we deprive [Northleaf] of a meaningful dividend, however, we are really throwing down the gauntlet; (i) we have shown that we are not a contender that will meet their price expectation on Clemens, (ii) we have signaled that we would use our governance rights to ensure we end up with a partner we like, (iii) we hurt their investment performance . . . by strangling dividends and (iv) we make OTUS less attractive for prospective buyers as it comes with a JV partner who obstructs distributions.[158]

Lenning expanded on this email exchange at trial.[159]  On leverage, Lenning explained that Odfjell and its parent company prefer low leverage because of the cyclicality of their business.[160]  OTUS maintains leverage at approximately three

---

[155] *See id.* at 1–11.

[156] JX-248.

[157] *Id.* at 1.

[158] *Id.*; Trial Tr. at 732:7–733:10 (Lenning).

[159] *See* Trial Tr. at 734:16–742:10 (Lenning).

[160] *Id.* at 737:1–15 (Lenning).

21

times EBITDA, in line with industrially owned terminal companies.[161] Lenning acknowledged that Odfjell wanted a dividend but they did not want OTUS leverage to exceed five times.[162]

The Odfjell SE board discussed the presentation on February 8, 2024.[163] According to the board minutes, "Lenning commented that if we intend to proceed with Project Clemens, then it will be unfortunate to proceed with dividends from OTUS at this point."[164] Iversen stated, Odfjell has to "put the hand-break on the dividend in order to first solve the items related to Project Clemens" and Odfjell wants distributions to show its shareholders the holding company can generate cash.[165]

A March 21, 2024 presentation explained Odfjell's financing strategy to the Odfjell SE board.[166] DNB, a Norwegian bank, could provide a $200 million bridge loan.[167] Then Odfjell SE could execute a "full refinancing of OTUS at 5x EBITDA."[168]

The presentation also updated the Odfjell SE board on Project Clemens.[169] It stated that if Odfjell pursued Project Clemens, "the recommended approach is to hold

---

[161] *Id.* at 737:16–738:7 (Lenning).

[162] *Id.* at 737:3–8 (Lenning).

[163] JX-252.

[164] *Id.* at 5.

[165] *Id.* at 6.

[166] JX-709 at 1, 9.

[167] *Id.* at 9.

[168] *Id.*

[169] *Id.* at 8.

back on distributions, actively pursue an agreement with Northleaf and use the inversion issue and dividends as a bargaining chip."[170]

Lenning met Storrow in March to discuss the buyout.[171] At the meeting, Lenning tried spinning the Inversion Tax Issue as a positive pressure point for Northleaf.[172] At trial, he explained: "I believed my stakeholders and my colleagues understood that [the Inversion Tax Issue] was something we would have to solve. And it was our problem, and that the acquisition was an elegant way of solving that problem."[173]

At this stage, Ramki wanted to involve senior leadership of Odfjell and Northleaf.[174] Lenning and Ramki arranged a meeting between Fotland and Storrow for March 8, 2024.[175] Lenning prepared call notes for Fotland.[176] The notes covered three areas: the Inversion Tax Issue, distributions, and an acquisition.[177]

Regarding distributions, the notes charted Odfjell's evolving stance.[178] Lenning stated that Odfjell's appetite for distributions changed because their shareholders already received dividends and Odfjell SE wanted to invest more in its

---

[170] *Id.*

[171] Trial Tr. at 749:10–750:12 (Lenning).

[172] *See id.* (explaining that the tax issue could be a "blessing in disguise" because it could convince Odfjell to pay a higher price).

[173] *Id.* at 750:5–9 (Lenning).

[174] *Id.* at 927:21–928:5 (Lenning).

[175] *Id.*; *see* JX-756 at 2.

[176] JX-756 at 2; JX-757.

[177] JX-757.

[178] *Id.* at 2–3.

terminals platform.[179]  And Odfjell uncovered the new Inversion Tax Issue associated with the restructuring.[180]  As a result, their desire for distributions "is really only about wanting to accommodate Northleaf" and  "[w]ithout a way around the inversion issue, [any distribution] is really a 'no-go' for [Odfjell][.]"[181]

On April 16, 2024, Ramki emailed Lenning with guidance on the valuation of OTUS.[182]  Northleaf expected a buyer to value OTUS at 13 times forward EBITDA or more.[183]

Lenning took this guidance back to the Odfjell SE board.[184]  The executive summary presented at the May 7, 2024 meeting stated that "Northleaf has expressed willingness to sell their share in [OTUS].  This is mainly due to our tax situation which prevents dividends."[185]  Odfjell SE management analyzed the different responses Northleaf could take given "[t]ax issues inhibiting near-term distributions."[186]  Ultimately, Odfjell SE management recommended that Odfjell give

---

[179] *Id.* at 3.

[180] *Id.*

[181] *Id.* at 3 (emphasis in original).

[182] JX-305 at 2.

[183] *Id.*

[184] JX-711 at 70.

[185] *Id.* at 3.

[186] *Id.* at 74.

24

Northleaf the option between a standstill agreement and another buyout offer, this time for $216 million.[187] The Odfjell SE board approved this approach.[188]

On May 14, Lenning gave Northleaf the two options.[189] Northleaf rejected Odfjell's $216 million offer because it believed a market-driven process would yield a higher offer.[190] But Northleaf wanted to explore the standstill agreement further.[191]

On August 14, 2024, Lenning sent a draft standstill agreement to Ramki.[192] The agreement aimed to reduce OTUS's leverage and stop distributions for 24 months.[193] The Members never agreed on a standstill agreement.[194]

On September 8, Ramki followed up to provide Northleaf's perspective on leverage.[195] Northleaf wanted the standstill to target 5.6x debt-to-EBITDA and a minimum of 4.75x.[196] Lenning pushed back.[197] On September 13, he replied, "[a] total leverage approaching 5 times EBITDA is already well above the levels Odfjell normally would be comfortable with."[198] Their other terminal businesses have

---

[187] *Id.* at 72, 76.

[188] JX-305; JX-710 at 8–9; Trial Tr. at 746:24–747:17 (Lenning).

[189] JX-305.

[190] JX-312.

[191] *Id.*; Trial Tr. at 374:17–375:1 (Ramki).

[192] JX-323 at 1.

[193] Trial Tr. at 381:19–382:4 (Ramki).

[194] JX-342 at 1; JX-714 at 1.

[195] JX-342 at 2.

[196] *Id.*

[197] *Id.* at 1.

[198] *Id.*

25

between zero and three times leverage.[199]  At trial, Lenning emphasized that Odfjell prefers a "strong balance sheet."[200]  Lenning concluded that Odfjell and Northleaf were "fundamentally misaligned" on leverage.[201]

I.     **Management Learns Of The Members' Dispute.**

Through the first half of 2024, management pursued the $350 million refinancing.[202]  Initially, they expected the Board's approval if they procured terms in line with their initial discussions at the November 2023 board meeting.[203]  White contacted "commercial banks, as well as . . . longer term [] debt investors, like insurance companies, [and] private capital credit funds."[204]  Those meetings considered a $350 million refinancing.[205]  Midway through the year, however, management learned that Odfjell opposed the refinancing and distributions.[206]

White believed the Inversion Tax Issue caused Odfjell to change positions.[207] White stated Odfjell was "very open to [distributions] towards the beginning of the year" and, "then they notified us that they had some tax issue, tax inversion issue

---

[199] *Id.*

[200] Trial Tr. at 737:10–738:10 (Lenning).

[201] JX-342 at 1.

[202] *See* Trial Tr. at 184:5–19 (White).

[203] *Id.* at 34:17–24 (Blanchard).

[204] *Id.* at 180:22–181:3 (White).

[205] *Id.* at 181:4–7 (White).

[206] *Id.* at 39:10–17 (Blanchard); *id.* at 184:5–11 (White).

[207] *Id.* at 184:20–185:3 (White).

that they needed to deal with, which would require them to potentially restructure."[208]

Blanchard's testimony supports White.[209] When asked why Odfjell changed its mind, he said, "my recollection was it was related to some tax issues that [Odfjell] had, and they did not want to go down the road of that full refinancing with a leveraged distribution."[210]

## J. Northleaf Declares Default.

On September 23, 2024, Northleaf shared with Odfjell three options to resolve their dispute over the refinancing and distribution.[211] First, Odfjell could buy out Northleaf for $275 million.[212] Second, Northleaf offered to enter into a standstill agreement committing to either 5.6x debt-to-EBITDA or if that is too high, then 5.0x with distributions as part of the original refinancing.[213] Third, if the first two options failed, Northleaf would send a notice of default under the LLC Agreement.[214]

Northleaf and Odfjell remained far apart on the standstill, so they continued negotiating a buyout.[215] Fotland increased Odfjell's offer to $235 million,[216] but

---

[208] *Id.* at 185:24–186:7 (White).

[209] *See id.* at 39:22–40:3 (Blanchard).

[210] *Id.*

[211] JX-353 at 1.

[212] *Id.*

[213] *Id.*

[214] *Id.*

[215] JX-356 at 2.

[216] Trial Tr. at 1047:21–1048:3 (Storrow); *id.* at 433:19–21 (Ramki); *id.* at 744:6–9 (Lenning); JX-356 at 2.

Storrow wanted an offer near $260 million[217] and viewed $235 million as "just too low."[218]  Storrow viewed the valuation gap as too wide.[219]  Storrow believed that it was time to "get legal."[220]

On October 8, 2024, Northleaf sent a notice of default to Odfjell (the "October 8 Notice") under Section 12.2 of the LLC Agreement demanding that Odfjell "cure its material breaches."[221]

The October 8 Notice accused Odfjell of breaching two provisions of the LLC Agreement: Section 5.1(a) obligating the Board to distribute Available Cash, and 6.1(c) binding Members to Board decisions.[222]  Both Sections 5.1(a) and 6.1(c) are quoted in the Legal Analysis.

For present purposes, it suffices to note that Northleaf based its claim of breach under Section 5.1(a) on the premise that "the Company has millions of dollars of Available Cash to distribute to the Members, which OTBV has caused the Company to not distribute[.]"[223]  And Northleaf based its claim under Section 6.1(c) on the premise that "the Board unanimously approved the 2024 Budget of the Company requiring the Company to seek a $350-million refinancing of the Company's existing

---

[217] JX-395 at 1.

[218] JX-395 at 1; *see also* Trial Tr. at 1072:7–12 (Storrow).

[219] JX-395 at 1.

[220] *Id.*

[221] JX-433.

[222] *Id.* at 1.

[223] *Id.*

28

credit facility and make certain distributions to the Members thereafter."[224] Northleaf argued that the Board's decision binds Odfjell, and that Odfjell breached the LLC Agreement by "caus[ing] the Company to make no effort to secure the required refinancing despite such Board approval[.]"[225]

### K.      Odfjell Responds To Northleaf's Notice Of Default.

Odfjell responded to the October 8 Notice through its counsel, Fried Frank, on October 15, 2024 (the "October 15 Letter").[226] The letter raised three points.

First, Odfjell denied Northleaf's assertion that the Company "has millions of dollars of Available Cash to distribute to the members[.]"[227] It stated that the "mere presence of cash on the Company's balance sheet does not mean there is Available Cash within the meaning of the [LLC Agreement]."[228] Odfjell argued that the LLC Agreement requires that the Board make a determination of Available Cash, which the Board never made.[229] Odfjell also reiterated that "the Company's largest debt obligations mature in March 2025," and "Northleaf categorically refused to consent to a simple amendment and extension of the Company's existing credit facilities, even on an interim basis, creating a potentially devastating liquidity crunch for the

---

[224] *Id.*

[225] *Id.*

[226] JX-453.

[227] *Id.* at 1.

[228] *Id.*

[229] *Id.*

29

Company . . . ."[230]  For this reason, "the Company requires <u>all available cash resources on hand</u>[.]"[231]

Second, Odfjell questioned Northleaf's assertion that the Board "unanimously approved the 2024 Budget of the Company requiring the Company to seek a $350 million refinancing of the Company's existing credit facilities and make certain distributions to the Members thereafter."[232]  Odfjell questioned whether the December 12 Written Consent was ever finalized, and noted that it does not contain any "agreement or approval by the Board to execute any refinancing agreements or to make any specific distributions in any specific amounts over any specific period of time."[233]  Odfjell further noted that "the mere approval of the 2024 Budget, which does not include any specific line items for a larger credit facility, specific terms and conditions of that facility, or any specific distributions, in no way committed the Company to take on substantial additional debt to fund distributions or to pay specific distributions to the Members as part of a refinancing."[234]  The letter detailed Odfjell's concerns over "increasing the Company's leverage solely to fund a distribution," and noted "the adverse tax consequence to OTBV of such a transaction."[235]

---

[230] *Id.* at 1–2.

[231] *Id.* at 2 (emphasis in original).

[232] *Id.*

[233] *Id.*

[234] *Id.*

[235] *Id.* at 3.

Finally, Odfjell directed Northleaf to the dispute resolution provisions in the LLC Agreement and stated that, if the parties could not agree, Odfjell would petition this court for a custodian to break the deadlock.[236]

## L.    The Board Holds An Emergency Meeting.

OTUS's existing credit facilities were set to expire on March 18, 2025.[237]  On October 14, 2024, just days after sending the October 8 Letter, Lenning called an emergency Board meeting to consider an amend-and-extend credit facility and avoid a "potentially devastating liquidity crunch."[238]

In response, Ramki offered two more resolutions for the Board to consider: (1) secure a $350 million refinancing and (2) make a $3 million distribution to the Members "on or before October 31, 2024 as Available Cash."[239]

Lenning replied, reiterating Odfjell's position on Available Cash.[240]  He stated that "[t]he mere presence of cash on the balance sheet does not equate to Available Cash under the [LLC Agreement]" and "[a]s [OTUS] is facing a maturity wall in March 2025, and we have not secured any refinancing of the existing debt . . . all cash on hand must be preserved."[241]

---

[236] *Id.*

[237] Trial Tr. at 113:12–15 (Blanchard); JX-468 at 2.

[238] JX-455 at 3.

[239] *Id.* at 2–3.

[240] *Id.* at 1.

[241] *Id.*

The Members held the emergency meeting on October 16, 2024, but they did not vote on the three resolutions.[242] The Board would reconvene on those items on November 19, 2024.[243]

## M. Management Requests Guidance On Refinancing.

Meanwhile, Company CEO Blanchard emailed a letter to the Board on October 20, 2024, seeking guidance regarding the refinancing.[244] He wrote:

> The Company's 2024 Budget contemplates a $350-million refinancing of the current credit facility and that refinancing has been set as a performance goal to complete for certain executives of the Company in 2024. However, after we started working on a potential refinancing earlier this year, [Northleaf] and [Odfjell] Managers instructed us to put that work on hold until we receive direction from the Board. As you know, to date, we have not yet received clear direction from the Board with respect to the refinancing. After reviewing [the October 8 Notice] and [the October 15 Letter], and based on recent discussions with [Northleaf] and [Odfjell] Managers, it still remains unclear what direction the Board would like the Company to take with respect to the current credit facility.[245]

He explained that he was "deeply concerned about [OTUS's] ability to address the current credit facility in a reasonable time period."[246] As a path forward, he proposed two options: (1) an amend-and-extend that would take approximately eight

---

[242] JX-521 at 2.

[243] *Id.* at 3.

[244] JX-468.

[245] *Id.* at 2.

[246] *Id.*

weeks and (2) a refinancing that would require "substantially more lead time and a credit rating, which will take more . . . time and resources to complete."[247]

Lenning replied all the next day, informing him that "the Board is actively discussing the Company's upcoming debt maturity and the available alternatives" and that everyone "recognize[d] the time-sensitive nature of this matter[.]"[248] Lenning also requested "indicative terms for what [Blanchard] described as option (1): 'amend & extend the current credit facility (i) at the current headline size of $250 million.'"[249]

Two days later, Ramki replied all, stating that Northleaf "is supportive of management reaching out to the existing lenders to understand the terms for an amend and extend."[250] But he accused Odfjell of unilaterally directing management to depart from the 2024 budget, which contemplated the $350 million refinancing.[251] He added that a refinancing process should only take six weeks based on prior discussions with Odfjell's bank.[252]

With management still on the email thread, Lenning escalated the disagreement further, accusing Northleaf of holding OTUS "hostage in the face of an impending debt maturity."[253]

---

[247] *Id.* at 2–3.

[248] JX-485 at 4.

[249] *Id.* at 4.

[250] *Id.* at 3.

[251] *Id.* at 3–4.

[252] *Id.* at 3.

[253] *Id.* at 2.

Blanchard responded on October 28, 2024, stating that management would obtain "indicative terms, timeline and process" for both the amend-and-extend and the $350 million refinancing option ahead of a November 2024 board meeting.[254] And Blanchard moved the Board meeting to Baker Botts because he did not want employees hearing "disruptions or loud discussions[.]"[255]

### N.     The Parties Clash At A November 19 Board Meeting.

During the November 19, 2024 Board meeting, Odfjell proposed the amend-and-extend, and Northleaf continued to press for the $350 million refinancing with a $3 million distribution.[256] Each side voted against the other's resolution.[257] Northleaf voted against the amend-and-extend.[258] And Odfjell voted against the refinancing and $3 million distribution resolutions.[259]

Odfjell and Northleaf also did not approve a 2025 budget. The Board working group had not performed its typical diligence to prepare a 2025 budget.[260] Northleaf refused to approve a budget if OTUS did not have the same leverage and distribution levels as contemplated during the November 2024 Board meeting.[261]

---

[254] *Id.* at 7.

[255] Trial Tr. at 49:2–18 (Blanchard).

[256] JX-521 at 3–4.

[257] *Id.*; Trial Tr. at 418:1–22 (Ramki).

[258] JX-521 at 4.

[259] *Id.* at 3–4.

[260] Trial Tr. at 399:9–17 (Ramki).

[261] JX-1017 at 68; Trial Tr. at 131:17–132:1 (Blanchard).

## O.    Mediation Fails.

The Members engaged in mediation on December 20, 2024.[262]  The mediation failed.  According to Storrow, "the mediation was a total waste of time."[263]  The Members remained at an impasse over a buyout.[264]  And they could not make progress on anything else.[265]

## P.    Northleaf Initiates This Litigation.

Northleaf initiated this action on December 23, 2024, seeking judicial dissolution and claiming breach of the LLC Agreement.[266]  The same day, Odfjell initiated an action in this court against Northleaf alleging breach of the LLC Agreement's implied covenant of good faith and fair dealing and seeking the appointment of a limited-purpose custodian to resolve the parties' dispute over financing.[267]  Northleaf then narrowed its claims to a single count for judicial dissolution.[268]  Both parties moved to expedite their claims.[269]

The court granted expedition during a January 17, 2025 hearing.[270]  The court, however, suggested appointing a custodian given the challenge of reaching a

---

[262] PTO ¶ 63.

[263] JX-1032 at 1.

[264] Trial Tr. at 1074:3–1075:17 (Storrow).

[265] JX-1032 at 1.

[266] Dkt. 1.

[267] PTO ¶¶ 5–6.

[268] Dkts. 17, 18.

[269] PTO ¶¶ 2, 5.

[270] *Id.* ¶ 10.

refinancing decision before March 18, the expiration of OTUS's then-current credit facility.[271]

On January 31, the court appointed former Vice Chancellor Joseph R. Slights III (the "Custodian") as a custodian to address the Members' dispute over refinancing.[272] He did a great job. The Custodian directed management to enter into an amended credit facility.[273] Management complied.[274]

Expedited litigation ensued. The court entered the parties' jointly proposed order governing the case schedule for both actions, which set trial for August 5 and 6, 2025.[275] Meanwhile, on March 13, Odfjell supplemented its complaint[276] and moved for summary judgment.[277] Northleaf moved to dismiss Odfjell's complaint and filed its second amended complaint, reviving its prior breach of contract and declaratory judgment claims.[278]

---

[271] *Id.*

[272] JX-616.

[273] PTO ¶ 12.

[274] *Id.* ¶ 17.

[275] *Id.* ¶ 19.

[276] *Id.* ¶ 14.

[277] *Id.* ¶ 18.

[278] *Id.* ¶ 16, 18.

36

On June 25, the court granted Northleaf's motion to dismiss Odfjell's supplemental complaint and denied Odfjell's motion for summary judgment.[279] The court also denied Odfjell's motion to dismiss the second amended complaint.[280]

Northleaf continued amending its complaint.[281] In its operative form, Northleaf's complaint contains five counts:

- In Count I, Northleaf seeks judicial dissolution of the Company under Section 18-802 of the Delaware LLC Act, asserting that it is no longer reasonably practicable to operate OTUS under the LLC Agreement;

- In Count II, Northleaf claims that Odfjell breached Section 5.1(a) of the LLC Agreement because it blocked OTUS from distributing Available Cash;

- In Count III, Northleaf claims that Odfjell breached Section 6.1(c) of the LLC Agreement because it blocked OTUS, its managers, and employees from securing the required financing contemplated under the 2024 budget;

- In Count IV, Northleaf claims that Odfjell breached the implied covenant of good faith and fair dealing when it pursued Project Clemens and sought to force Northleaf to sell its 49% interest in OTUS; and

- In Count V, Northleaf seeks a declaration that (i) Odfjell has defaulted on its obligations under the LLC Agreement; (ii) Odfjell failed to cure its defaults within 60 days; and (iii) Northleaf now has the right to issue a "Call Notice" and buy out Odfjell's stake in OTUS at a price equal to 85% of the "Fair Market Value" as described in the LLC Agreement.[282]

---

[279] *Id.* ¶ 20.

[280] *Id.* ¶ 21.

[281] Dkt. 188 ("Third Am. Compl.").

[282] Third Am. Compl. ¶¶ 67–115; LLC Agreement §§ 2.1, 12.4. Odfjell moved to dismiss Northleaf's operative complaint. Odfjell argued that Count I failed for lack of subject matter jurisdiction under Court of Chancery Rule 12(b)(1) because Section 3.12(c) of the LLC Agreement bars dissolution claims. Dkt. 199 at 1. Odfjell also moved to dismiss Count IV under Court of Chancery Rule 12(b)(6). *Id.* at 2. Odfjell deferred argument on its motion to trial and post-trial briefing under Court of Chancery Rule 12(i). *Id.*

The court rescheduled and held trial on September 2 through 5, 2025.[283]  The parties completed post-trial briefing on November 19, and the court held post-trial argument on December 15, 2025.[284]

Motion practice continued post-trial.  Northleaf moved to compel Odfjell to produce documents related to the Inversion Tax Issue.[285]  The court granted the motion.[286]  In response, Odfjell moved for a declaration that the trial record was closed or in the alternative, an order compelling reciprocal production.[287]  The court denied the motion after reviewing the reciprocal documents *in camera*.[288]  The parties completed supplemental briefing on the documents produced under Northleaf's initial motion to compel on April 15, 2026.[289]  The trial record closed five days later.[290]

**Q.    OTUS's Recent Operations**

Because this case involves dissolution, it is important to reflect on OTUS's recent operations.

---

[283] Dkt. 192.

[284] Dkts. 225, 227.  That cold winter day, the Leonard L. Williams Justice Center lost heat and experienced mild flooding because of the subsequent pipe leaks.  Dkt. 230. Post-trial oral argument took place at the office of Young Conaway, located at 1000 North King Street, Wilmington, Delaware 19801.  *Id.*  The court appreciates the parties' flexibility.

[285] Dkt. 208.

[286] Dkt. 238.

[287] Dkt. 240.

[288] Dkt. 250.

[289] Dkt. 258.

[290] Dkt. 261.

On February 11, the Custodian supported a one-year extension of the credit facility with the option of an additional year.[291] He also supported increasing the distribution limits under the credit facility.[292]

Management, however, needed a Board-approved budget to execute the refinancing.[293] Northleaf refused to approve any budget that did not contain the same leverage levels and distributions as in 2024.[294] To compromise, the Board approved a "Management Plan."[295] Functionally, the Management Plan operates as a short-term budget.[296] It gave management a plan for 2025 EBITDA and capital expenditures.[297] But it did not address any major financing issues or long-term plans.[298]

With the Management Plan in place, OTUS refinanced its credit facility.[299] On October 28, 2025, the Custodian ordered OTUS to execute the additional one-year extension, securing financing until March 2027.[300]

---

[291] JX-629 at 2, 7.

[292] *Id.* at 8.

[293] JX-1017 at 67.

[294] *Id.* at 68.

[295] JX-634 at 20–25.

[296] Trial Tr. at 129:18–130:7 (Blanchard).

[297] *Id.*

[298] *Id.* at 404:1–3 (Ramki).

[299] JX-640.

[300] Dkt. 221, Ex. A at 8.

On April 1, 2025, Lenning suggested a distribution because OTUS no longer "fac[ed] an immediate maturity wall."[301] The suggestion, however, devolved into further argument over the definition of Available Cash and accusations of manufacturing evidence for the Members' litigation.[302] As part of the discussion, White showed the Board the impact of a distribution on OTUS's cash and debt balances.[303] Eventually, the Members agreed on a $17.8 million distribution without agreeing on what Available Cash means.[304] The Board formally approved the distribution on July 24, 2025.[305]

At trial, Lenning stated the Board planned to make another distribution of "$2.2 million at the end of [2025]."[306]

According to OTUS management, the Members' dispute has had a limited impact on daily operations. Blanchard testified that OTUS's departments still work together,[307] it has maintained its relationships with its banks,[308] and employee turnover remains normal.[309] Further, at the time of trial OTUS was considering

---

[301] JX-1018 at 4–5.

[302] *See id.* at 1–3.

[303] JX-659 at 2–3.

[304] *Id.* at 1.

[305] JX-1028.

[306] Trial Tr. at 766:16–21 (Lenning).

[307] *Id.* at 118:3–10 (Blanchard).

[308] *Id.* at 55:5–13 (Blanchard).

[309] *Id.* at 66:18–67:2 (Blanchard).

40

building a new tank at its Charleston terminal.[310] White, however, acknowledged that the Members disagree on compensation for key personnel.[311]

The Members' disagreement has harmed long-term planning. In March 2025, Blanchard wrote Lenning and Ramki explaining the "shareholder misalignment eliminates our ability to talk through how we manage long term strategic aspects of the business (Refinancing, long term investment, cash on [balance sheet]—distribution/leverage/investment, M&A, etc)."[312] Blanchard proposed cancelling the Board's annual strategy session in 2025.[313] At trial, Blanchard testified that the disagreement between Northleaf and Odfjell "has a huge impact on the long-term strategy," because "I don't know where this business is going to be in a year."[314] Again, White's testimony tracks Blanchard's. White stated the Members' dispute has impacted management of strategic initiatives.[315] But the dispute has had a lesser impact on day-to-day operations.[316]

Thus, since this litigation began, OTUS has renewed its credit facility twice, distributed $17.8 million to the Members, and continued to operate its terminals business. The Members' dispute has affected long-term planning but has not impacted day-to-day operations.

---

[310] *Id.* at 68:12–21 (Blanchard).

[311] *Id.* at 261:7–24 (White).

[312] JX-649 at 4.

[313] *Id.*

[314] Trial Tr. at 61:16–62:12 (Blanchard).

[315] *Id.* at 199:4–8 (White).

[316] *Id.*

## II.  LEGAL ANALYSIS

Northleaf claims that Odfjell breached Sections 5.1(a) and 6.1(c) of the LLC

Agreement and the implied covenant of good faith and fair dealing.  Northleaf also

claims that it is entitled to an order of judicial dissolution because the Members'

dispute renders them deadlocked, making it no longer reasonably practicable to

operate OTUS in conformity with the LLC Agreement.  This analysis has two parts.

Part A addresses whether Odfjell breached any express or implied term of the LLC

Agreement.  Part B addresses Northleaf's claim for judicial dissolution.

### A.  Breach Of The LLC Agreement

The LLC Agreement provides that, upon a finding of "Breach," a non-

defaulting member may issue a call notice to purchase the defaulting member's units

for 85% of the Fair Market Value.[317]  Section 12.1 of the LLC Agreement defines

"Breach" as a "material breach of any of [a Member's] obligations under [the LLC

---

[317] LLC Agreement § 12.4 (providing that "In the event that a final, non-appeallable order of a court of competent jurisdiction determines that a Breach has occurred (and has not been fully remedied within 60 days of delivery of the Default Notice applicable to such Breach), the Non-Defaulting Member shall . . . be entitled to exercise, upon written notice to the Defaulting Member (the *"Call Notice"*) . . . such Non-Defaulting Member's election to purchase all (but not less than all) of the Units held by the Defaulting Member for a cash purchase price equal to 85% of Fair Market Value of such Units (the *"Call Price",* and such Units, the *"Called Units").* The Defaulting Member shall be obligated to sell, assign, convey and deliver the Units held by such Person to the applicable Non-Defaulting Member (for the Call Price), free and clear of liens and other encumbrances, following the FMV Call Determination; provided that the Non-Defaulting Member shall not be obligated to consummate the purchase of the Called Units earlier than the date that is fifteen (15) Business Days following the FMV Call Determination. The Fair Market Value of such Called Units shall be determined in accordance with Section 12.5.").

Agreement]" that the Member does not remedy "within 60 days."[318]  A breach by Odfjell triggers Northleaf's call right under the LLC Agreement's Section 12.4.  The call right entitles Northleaf to purchase Odfjell's interest in OTUS at 85% of Fair Market Value.[319]

Northleaf claims that Odfjell breached Section 5.1(a) by failing to distribute Available Cash, Section 6.1(c) by obstructing binding Board decisions, and the implied covenant of good faith and fair dealing by pursuing Project Clemens. Northleaf further claims each breach constituted a Breach under Section 12.1 triggering Northleaf's call rights under Section 12.4.

"The first step when analyzing a case involving the internal affairs of an LLC is . . . to examine the LLC agreement to determine whether it addresses the issue.  If the agreement covers the issue, the agreement controls."[320]  The LLC Agreement is governed by Delaware law, so Delaware's principles of contract interpretation apply.[321]  Delaware courts follow the objective theory of contracts, giving words "their plain meaning unless it appears that the parties intended a special meaning."[322]  In practice, the objective theory of contracts requires that a court "give priority to the

---

[318] *Id.* § 12.1.

[319] *Id.* § 12.4.

[320] *Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 923 (Del. 2023) (quoting *In re Coinmint, LLC*, 261 A.3d 867, 900–01 (Del. Ch. 2021)).

[321] LLC Agreement § 15.6.

[322] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013) (citing *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008)).

parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[323]

Applying these principles, Odfjell did not breach the LLC Agreement in any of the three ways Northleaf claims. Counts II, III, and IV thus fail. Count V for declaratory relief based on the three predicate Counts also fails.

### 1.    Available Cash Distributions

Section 5.1(a) states that "[t]he Board *shall cause* the Company to distribute Available Cash with respect to a given Fiscal Quarter promptly following the conclusion thereof." [324]   Under the LLC Agreement, "Available Cash" means:

> as of any date of determination with respect to cash distributions to be made to the Members as determined by the Board, the following, without duplication: (a) all cash and cash equivalents of the Company from any and all sources as of the time of such determination less (b) as of the time of such determination, the portion thereof, as *determined by the Board in good faith*, which will be used to pay or establish appropriate reserves for all Company expenses and costs, including, without limitation, in respect of Company indebtedness or which are contemplated by the Initial Budget or any then-applicable Budget or the Business Plan.[325]

Latching on to the "shall cause" language of Section 5.1(a), and the "good faith" requirement of the definition of "Available Cash," Northleaf argues that Odfjell breached Section 5.1(a) because it did not cause the Company to make quarterly

---

[323] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[324] LLC Agreement § 5.1(a) (emphasis added).

[325] *Id.* § 2.1, "Available Cash" (emphasis added).

distributions and instead blocked them.[326] According to Northleaf, the Company had millions of Available Cash in early 2024. The Board was obligated to cause quarterly distributions of Available Cash.[327] But Odfjell knew that "strangling dividends" would be "highly value destructive" to Northleaf and would cause Northleaf to sell its interest at a "gentle force" discount.[328] So Odfjell implemented its "no dividend" plan in bad faith to further Project Clemens.[329]

There are many problems with Northleaf's argument. The first is that the existence of Available Cash requires a Board determination. By referencing a Board "determination" three times, the definition of Available Cash reflects that distributions come after a Board determination. And determining Available Cash requires that the Board consider many factors. As Ramki acknowledged at trial, determining "Available Cash" is "not a . . . straight calculation. It's not pluses and minuses" left to management.[330] Rather, calculating "Available Cash" involves "judgment calls" made by the Board.[331]

Northleaf's complaint regarding distributions spans a period beginning "[i]n early 2024."[332] For most of the period, however, there was no Board meeting nor

---

[326] Dkt. 214 ("Northleaf's Post-Trial Opening Br.") at 51–53.

[327] Trial Tr. at 911:5–14 (Lenning) (admitting that "shall cause" is mandatory).

[328] JX-248 at 1; JX-755 at 7.

[329] Dkt. 225 ("Northleaf's Post-Trial Reply Br.") at 21.

[330] Trial Tr. at 484:22–485:7 (Ramki).

[331] *Id.*

[332] *See, e.g.*, Northleaf's Post-Trial Opening Br. at 52.

Board determination on Available Cash. Because there was no Board determination on Available Cash, Odfjell did not breach any obligation to distribute Available Cash.

Northleaf's Board members could have forced a determination. Northleaf argues that they did not do so because it would have been futile, and Delaware law does not require that directors engage in futile acts.[333] Effectively, Northleaf argues that they did not need to call a vote because Odfjell would not have made a determination in the best interest of OTUS. But forcing the issue would have forced the discussion. Had Odfjell voted against distributions, they would have had to state why. Because there was no discussion, there is no certainty as to what Odfjell would have done or why they would have done it.

Northleaf also argues that it impliedly forced a Board determination on Available Cash at the November 2024 Board meeting. But even then, Northleaf's proposed resolution was elliptically worded. Northleaf did not propose that the Board determine the amount of Available Cash. Rather, Northleaf proposed that the Board direct management to secure a $350 million refinancing and distribute $3 million to the Members "as Available Cash."[334]

Even if the Board's November 2024 vote on Northleaf's proposed resolution served as a determination of Available Cash, Northleaf has not proven that Odfjell breached Section 5.1(a) by voting against the resolution. Northleaf argues that OTUS had plenty of cash on the books, citing a document prepared by management

---

[333] *Id.* at 52–53 (citing *Ford v. VMware, Inc.*, 2017 WL 1684089, at *13 (Del. Ch. May 2, 2017) ("Delaware law does not require that directors engage in futile acts.")).

[334] JX-521 at 2.

46

reflecting Available Cash.[335]  But that document assumed an extension of the existing debt that Northleaf was then blocking.[336]  And Odfjell voted against distributions because it was not certain that OTUS would extend its current debt, and Odfjell wanted to reserve the Company's cash in the event it defaulted on the debt facility in March 2025.[337]

Northleaf denies that Odfjell had a legitimate fear of default—Odfjell understood that the Company could fully refinance if needed in six weeks.[338]  Rather, Odfjell took the position because cutting off distributions served its goal under Project Clemens to force Northleaf into selling on the cheap.  But Odfjell had no way of knowing that Northleaf would back down and agree to extend OTUS's existing credit facility.[339]  In fact, the parties did not execute an amended credit facility until March 14, 2025, four days before default.[340]

Beneath Northleaf's claim regarding Available Cash is its position that the parties always intended leveraged distributions.  Northleaf argues that the LLC Agreement endorsed leveraged distributions by including in the definition of Available Cash "all cash *and cash equivalents* of the Company *from any and all*

---

[335] Northleaf's Post-Trial Opening Br. at 52 (citing JX-1061).

[336] JX-1061 ("The analysis assumes . . . an amend and extend refinancing in Q4 [2024]").

[337] JX-453 at 2; JX-521 at 3–4.

[338] Trial Tr. at 868:23–869:5 (Lenning); JX-258 at 9.  DNB's illustrative refinancing timeline, however, acknowledged that credit approvals may take up to three to four additional weeks for new banks.  *Id.*

[339] JX-337 at 1; JX-448 at 1; Trial Tr. at 53:5–1, 125:22–24 (Blanchard).

[340] JX-640; Trial Tr. at 125:4–10 (Blanchard).

*sources.*[341]  But the LLC Agreement deducts from Available Cash amounts "used to pay or establish appropriate reserves . . . in respect of Company indebtedness."[342] Northleaf also argues that Odfjell historically indicated its agreement to leveraged distributions.  But at trial, Odfjell witnesses credibly testified Odfjell SE had historically taken a conservative stance towards leverage, preferring a "strong balance sheet."[343]  As Lenning said, "from day 1" Odfjell has pushed back on leverage.[344]  When negotiating the standstill agreement, Lenning stated, "[a] total leverage approaching 5 times EBITDA is already well above the levels Odfjell normally would be comfortable with."[345]  Lenning testified that Odfjell prefers assets with low leverage to weather the inevitable downturns in the cyclical terminals business.[346]

Ultimately, the Board had an obligation to determine Available Cash in good faith.  The LLC Agreement defines "good faith" as "the reasonable belief that a determination, action or omission is in the best interests of the Company."[347]  Odfjell may have had additional motivations for voting against distributions related to

---

[341] LLC Agreement § 5.1 (emphasis added); Northleaf's Post-Trial Opening Br. at 51; *see also* JX-76 at 8–11 (discussing "$70M of distribution to shareholders through 2025, starting in 2022" and "Debt funding options to increase leverage . . . to support distributions and growth").

[342] LLC Agreement § 2.1, "Available Cash."

[343] Trial Tr. at 737:3–15 (Lenning).

[344] JX-248 at 1.

[345] JX-342 at 1.

[346] Trial Tr. at 737:10–738:14 (Lenning).

[347] LLC Agreement § 15.16.

Project Clemens. But on the issue of good faith, the nature of a leveraged distribution works against Northleaf. Borrowing money to pay distributions does not benefit the Company itself. It benefits its owners.[348] Thus, declining leveraged distributions did not breach any good faith obligation of Odfjell to the Company.

Odfjell did not breach Section 5.1(a) of the LLC Agreement.

### 2. Binding Board Decisions

Section 6.1(c) of the LLC Agreement provides: "[d]ecisions or actions taken by the Board in accordance with the provisions of this Agreement shall constitute decisions or actions by the Company and shall be binding on each Member . . . ."[349]

Plaintiff argues Odfjell breached Section 6.1(c) by disavowing the 2024 budget and "obstructing" management from seeking refinancing terms.[350] Each argument rests on a faulty factual proposition.

Odfjell did not disavow anything. Northleaf bases this claim on the October 15 Letter. In that letter, Odfjell challenged Northleaf's assertion that the Board "unanimously approved the 2024 Budget of the Company requiring the Company to seek a $350 million refinancing of the Company's existing credit facilities and make

---

[348] *See In re Appleseed's Intermediate Hldgs., LLC*, 470 B.R. 289, 294, 303 (D. Del. 2012) ("[T]he [leveraged] dividend, by definition, provided no substantial benefit to the corporation, but instead benefitted the shareholders . . . Defendants appropriated a large portion of the funds for themselves while returning no value to the corporation.").

[349] LLC Agreement § 6.1(c).

[350] Northleaf's Post-Trial Opening Br. at 54 (citing Trial Tr. at 168:6–169:5, 188:4–189:1 (White); *id.* at 52:11–18 (Blanchard)).

certain distributions to the Members thereafter" in two ways.[351] Odfjell first questioned whether the December 12 Written Consent was fully executed and further questioned whether the Board approved a $350 million refinancing with distributions. As discussed above, the Board approved the 2024 budget by written consent.[352] The written consent instructed the "officers and employees . . . to do all such acts as may be necessary to carry out the deeds intended in the budget."[353] And the 2024 budget considered a $350 million refinancing.[354] But it did not require or approve one. Nor did the Board's approval of the 2024 budget commit the Company to take on substantial additional debt to fund distributions or to pay specific distributions to the Members as part of a refinancing. The letter does not constitute a breach of Section 6.2.

Odfjell did not "obstruct" management in any event. Both Blanchard and White testified that management worked on the refinancing as the 2024 budget contemplated.[355] They further testified that they decided to stop work due to Odfjell's Inversion Tax Issue. Because the budget did not require them to execute a refinancing, pausing pursuit of the financing does not evidence Odfjell's breach of Section 6.1(a). Northleaf cites Lenning's response to Blanchard's request for

---

[351] JX-453 at 2.

[352] *See supra* Section I.D.

[353] JX-266 at 2.

[354] *See* JX-189 at 1, 3, 8, 39, 43.

[355] Trial Tr. at 168:6–169:5, 188:4–189:1 (White); *id.* at 52:11–18 (Blanchard).

refinancing guidance as evidence of interference.[356]  But Lenning only requested "indicative terms for what [Blanchard] described as option (1): 'amend & extend the current credit facility (i) at the current headline size of $250 million.'"[357]  And in a follow-up email, Ramki stated Northleaf "is supportive of management reaching out to the existing lenders to understand the terms for an amend and extend."[358]  If anything, both Members agreed on management's pursuit of a potential amend-and-extend.

Odfjell did not breach Section 6.1(a) of the LLC Agreement.

### 3. Implied Covenant

"The implied covenant of good faith and fair dealing inheres in every contract and ensures that neither party acts arbitrarily or unreasonably to frustrate the fruits of their bargain."[359]  "It authorizes a court to imply terms only 'where obligations can be understood from the text of a written agreement but have nevertheless been omitted in the literal sense,' and only to protect the 'reasonable expectations' that the parties shared at signing."[360]  Delaware courts will not use the covenant to "rewrite the contract to appease a party who later wishes to rewrite a contract [it] now believes to have been a bad deal."[361] "Rather, the covenant is a narrow gap-filling tool of last

---

[356] Northleaf's Post-Trial Opening Br. at 54 (citing JX-484).

[357] JX-485 at 4.

[358] *Id.* at 3.

[359] *Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 253 (Del. 2026).

[360] *Id.* (quoting *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998)).

[361] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

resort."[362]  The key inquiry is "whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter."[363]

Northleaf claims that Odfjell breached the covenant of good faith and fair dealing implied in the LLC Agreement by pursuing Project Clemens.[364]  Northleaf argues that Project Clemens was a coercive negotiating strategy, and that Odfjell used the Inversion Tax Issue as a pretense to block dividends and position itself to buy out Northleaf's stake on the cheap.[365]

Northleaf's appeal to fairness is understandable.  The record reflects that Odfjell recommended "hold[ing] back on distributions" and using the "inversion issue and dividends as [a] 'bargaining chip.'"[366]  Lenning acknowledged that depriving Northleaf of dividends would "hurt their investment performance . . . by strangling dividends" and "make OTUS less attractive for prospective buyers as it comes with a JV partner who obstruct distributions."[367]  And Odfjell projected that by using "gentle force," it could achieve a discounted transaction in the $215–$225 million range.[368]

---

[362] *Johnson & Johnson*, 352 A.3d at 253.

[363] *ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 1003 (Del. Ch. 2023) (citation modified).

[364] Northleaf's Post-Trial Opening Br. at 54–57.

[365] *Id.* at 55.

[366] JX-755 at 5.

[367] JX-248 at 1; Trial Tr. at 732:24–733:10 (Lenning).

[368] JX-755 at 7.

At base, however, Northleaf seeks to imply a requirement concerning distributions, which Section 5.1 of the LLC Agreement expressly covers. Section 5.1 establishes the parties' distribution obligations. It does not require leveraged distributions nor require OTUS to borrow money to fund distributions. Within Section 5.1 sits an express gap-filler—the obligation to determine Available Cash in good faith. The LLC Agreement defines good faith as "the reasonable belief that a determination, action or omission is in the best interests of the Company."[369] As discussed above, Odfjell did not breach its contractual obligation to act in the best interest of the Company. Section 5.1 contains no obligation that Odfjell act in the best interests of *the Members* when voting on distributions and determining Available Cash. And the court cannot imply it. Rather, the court must conclude that the parties intended to exclude from the definition of "good faith" determinations, actions, or omissions in the best interests of *the Members*.[370]

Odfjell did not breach the implied covenant of good faith and fair dealing.

## B. Judicial Dissolution

Northleaf seeks judicial dissolution under Section 18-802 of the LLC Act based on Board deadlock over leveraged distributions. In response, Odfjell asserts a contractual defense and argues against deadlock. As its contractual defense, Odfjell claims that Section 3.12(c) of the LLC Agreement prevents Northleaf from seeking

---

[369] LLC Agreement § 15.16.

[370] *See Vintage Rodeo Parent, LLC v. Rent-a-Ctr., Inc.*, 2019 WL 1223026, at *21 (Del. Ch. Mar. 14, 2019) ("As a matter of contractual interpretation, I should refrain from writing a provision into a contract when the parties could have done so themselves, but chose not to.").

judicial dissolution. It does not. Section 3.12(c) limits only the Company and the Board, not a Member exercising its independent statutory right to seek judicial dissolution. But Odfjell prevails on the merits. Northleaf has not shown the severe dysfunction required under 6 *Del. C.* § 18-802 for dissolution: OTUS continues to operate, manage its business, maintain key relationships, and pursue investments despite the Members' disputes. Because OTUS can still carry out its contractual purpose of operating a specialty chemical storage business, the dissolution claim fails.

### 1. Odfjell's Contractual Defense

Section 3.12 states:

> [n]otwithstanding anything to the contrary in this Agreement, *the Company* shall not take, and it shall cause each of its Subsidiaries not to take, and *the Board* shall not approve or otherwise delegate its power or authority to any other Person to take or approve, any of the following actions without unanimous consent of the Members: . . .[371]

Section 3.12(c) then lists dissolution as an action.[372] The provision thus restricts the Company and the Board from seeking dissolution without unanimous Member consent.

Odfjell argues that Section 3.12(c) prohibits Northleaf from seeking dissolution. But Section 3.12(c) does not apply to Members. Northleaf petitioned this court for judicial dissolution as a Member. Thus, Section 3.12(c) does not prohibit Northleaf's claim for judicial dissolution.[373]

---

[371] LLC Agreement § 3.12 (emphasis added).

[372] *Id.* § 3.12(c).

[373] Contrary to Odfjell's position, Northleaf did not waive its response to this argument in briefing. *See* Dkt. 221 ("Odfjell's Post-Trial Answering Br.") at 61. And

54

Section 13.1 of the LLC Agreement governing dissolution supports the conclusion that the LLC Agreement does not preclude Members from seeking judicial dissolution. That provision states that "[t]he Company shall dissolve and its affairs shall be wound up the first to occur of the following: (a) the unanimous consent of all Managers to dissolve the Company; and (b) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act."[374] In other words, OTUS can dissolve in one of two ways—by unanimous Board consent or by court decree. For a court to decree dissolution, someone must file a petition. Thus, a reading that allows a Member to petition for judicial dissolution is consistent with Section 13.1.

Odfjell argues that Section 13.1 is conjunctive, meaning that it requires unanimous written consent of Members *and* a judicial decree.[375] But this court must attempt to give meaning to each term when interpreting a contract.[376] Reading the "and" in Section 13.1 to require both conditions violates this canon by rendering the phrase "first to occur" meaningless.

Section 3.12 does not defeat Northleaf's claim for judicial dissolution.

---

it properly addressed Odfjell's arguments in its reply. Northleaf's Post-Trial Reply Br. at 22–28.

[374] LLC Agreement § 13.1.

[375] Odfjell's Post-Trial Answering Br. at 64–66.

[376] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

## 2. The Merits

Section 18-802 of the LLC Act authorizes the court to enter an order of judicial dissolution "on application by or for a member or manager . . . of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability agreement."[377] "The court will not dissolve an LLC merely because the LLC has not experienced a smooth glide to profitability or because events have not turned out exactly as the LLC's owners originally envisioned[.]"[378] "Given its extreme nature, judicial dissolution is a limited remedy that this court grants sparingly."[379]

This court has held that managerial deadlock renders it reasonably impracticable to carry on the business of an LLC.[380] Even profitable businesses may find themselves in a managerial deadlock that justifies dissolution.[381]

"In the context of judicial dissolution, deadlock refers to the inability to make decisions and take action."[382] When applied to a vote of a board, "deadlock" means a

---

[377] 6 *Del. C.* § 18-802.

[378] *In re Arrow Inv. Advisors, LLC*, 2009 WL 1101682, at *2 (Del. Ch. Apr. 23, 2009).

[379] *Id.*; *see also Mehra v. Teller*, 2021 WL 300352, at *19 (Del. Ch. Jan. 29, 2021).

[380] *Vila v. BVWebTies LLC*, 2010 WL 3866098, at *7 (Del. Ch. Oct. 1, 2010) (noting "deadlock has classically provided the basis for a dissolution").

[381] *See, e.g.*, *Seokoh, Inc. v. Lard-PT, LLC*, 2021 WL 1197593, at *8 (Del. Ch. Mar. 30, 2021) (explaining "dissolution may be warranted even where an LLC is 'technically functioning' and 'financially stable'" (quoting *Fisk Ventures, LLC v. Segal*, 2009 WL 73957 (Del. Ch. Jan. 13, 2009), *aff'd*, 984 A.2d 124 (Del. 2009))); *Haley v. Talcott*, 864 A.2d 86, 96 (Del. Ch. 2004) (finding dissolution appropriate even though LLC had ongoing business).

[382] *In re GR BURGR, LLC*, 2017 WL 3669511, at *6 (Del. Ch. Aug. 25, 2017) (quoting *Meyer Nat. Foods LLC v. Duff*, 2015 WL 3746283 (Del. Ch. June 4, 2015)).

56

failure to meet a voting threshold.[383] Depending on the applicable voting standard, a failure to meet a voting threshold can result from the presence of negative votes or the lack of affirmative votes.[384]

Here, Odfjell and Northleaf each appoint one-half of the OTUS Board, which requires either majority or unanimous approval to act, and the LLC Agreement has no term designed to break a deadlock. Thus, there is plenty of opportunity for deadlock.

But "[n]ot all deadlocks justify dissolution, as courts will seldom find that deadlock over an insignificant business decision warrants terminating the entity."[385] For a deadlocked decision to justify judicial dissolution, the decision at issue must be qualitatively significant. Delaware business statutes capture this qualitative requirement in various ways. Relevant here, the LLC Act provides for judicial dissolution "whenever it is not reasonably practicable to carry on the business."[386]

---

[383] *Duff*, 2015 WL 3746283, at *3 (defining deadlock as an "inability to make decisions and take action, such as when an LLC agreement requires an unattainable voting threshold"); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.10[c][3] (2d ed. 2022) ("[T]he deadlock must stem from the inability of the board to muster sufficient votes to take curative action due to the division of opinion.").

[384] *See Licht v. Storage Tech. Corp.*, 2005 WL 1252355, at *1 (Del. Ch. May 6, 2005) (affirming the "widely-accepted notion" that abstentions are negative votes); *In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256, at *6 (Del. Ch. June 27, 2011) (holding in the context of stockholder votes under 8 *Del. C.* § 251(b) that "not voting is the same as voting against" a corporate action).

[385] *Teller*, 2021 WL 300352, at *19.

[386] 6 *Del. C.* § 18-802; *see also* 6 *Del. C.* § 17-802 (providing for the dissolution of a limited partnership "whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement"); 8 *Del. C.* § 273(a) (providing

"Serious managerial issues, such as strategic visions, major initiatives, and the operation and control of a company, will typically satisfy the qualitative requirements imposed by statute and common law."[387]

Northleaf identifies a single issue on which the parties are deadlocked—leveraged distributions. When the court asked Ramki point blank to identify "the decision points that you say the board is deadlocked on,"[388] he pointed to leveraged distributions only.[389] The problem for Northleaf is that there is no current Board deadlock over distributions. In July 2025, the Board approved $17.8 million in distributions.[390]

Moreover, a dispute over leveraged distributions does not threaten the Company's business purpose.[391] Delaware courts will dissolve an LLC "where the defined purpose of the entity was fulfilled or impossible to carry out."[392] "When

---

for dissolution of corporate joint ventures if the "stockholders shall be unable to agree upon the desirability of discontinuing such joint venture").

[387] *Teller*, 2021 WL 300352, at *19.

[388] Trial Tr. at 595:7–10 (Ramki).

[389] *See id.* at 590:14–600:20, 393:18–394:9 (Ramki); *see also* JX-588 ¶ 4 ("In sum, the Members are now deadlocked because OTBV, at its parent's direction, has refused to perform the approved 2024 Budget to seek refinancing . . . and has opposed making any distributions for at least the next two or more years."); Ramki Dep. Tr. at 17:17–19:15 (identifying as deadlock issues only "refinancing," "distributions," and matters derivative of refinancing and distributions).

[390] JX-1028.

[391] *See Appleseed's*, 470 B.R. 289, 303 ("[T]he [leveraged] dividend, by definition, provided no substantial benefit to the corporation, but instead benefitted the shareholders . . . . Defendants appropriated a large portion of the funds for themselves while returning no value to the corporation.").

[392] *Duff*, 2015 WL 3746283, at *3 (quoting *In re Seneca Invs. LLC*, 970 A.2d 259, 262–63 (Del. Ch. 2008)).

58

analyzing purpose, the court looks to the parties' foundational contractual agreement and asks whether it is reasonably practicable to carry on the business in line with that purpose, not whether 'the purpose . . . has been completely frustrated.'"[393] OTUS's LLC Agreement defines its "Business" as "the construction, operation, maintenance, commercialization and management of independent tank storage and associated services for liquid chemicals, oil, biofuels, edible oils and gases."[394] No evidence suggests that OTUS has been rendered incapable of fulfilling this mission due to a lack of leveraged distributions.[395] As explained above, the Board has continued to manage OTUS throughout the Members' disagreement over a leveraged distribution.

In briefing, Northleaf argues that deadlock extends "far beyond" the issue of leveraged distributions. According to Northleaf, the Board cannot agree on the "meaning of 'Available Cash,'" and "cannot approve budgets," and cannot "even hold meaningful budgeting or strategy session meetings."[396]

But again, Northleaf's arguments lack factual support. When the Board issued distributions in 2025, the Board did not dispute the meaning of Available Cash. And Ramki admitted that there's no current dispute as to the amount of cash available for distribution because all agree that "it's a high enough number that [the Board] didn't

---

[393] *Id.* (quoting *Segal*, 2009 WL 73957, at *4).

[394] LLC Agreement § 2.1, "Business."

[395] Trial Tr. at 199:4–8 (White).

[396] Northleaf's Post-Trial Opening Br. at 60–61.

have to calculate it."[397] There is also no current dispute over financing. The Custodian solved the Company's debt crisis. OTUS successfully refinanced its debt in March 2025, and the Custodian later directed management to enter into a financing extension into 2027.[398] Claims that a future deadlock may arise in 2027 cannot justify dissolution.[399]

Northleaf argues that the Board's disagreement on how to finance the Company[400] is preventing management from planning for the Company's future,[401] and that this alone justifies dissolution.[402] Yet Northleaf cites no authority for the proposition that management's inability to plan further out justifies judicially forced dissolution of an otherwise healthy company.

In the end, Northleaf wants out of what it describes as "an under-levered, minimally yielding asset with no practical exit mechanism."[403] But it is not the

---

[397] Trial Tr. at 597:16–598:21 (Ramki).

[398] Dkt. 221, Ex. A at 8.

[399] *See In re Doehler Dry Ingredient Sols., LLC*, 2022 WL 4281841, at *8 (Del. Ch. Sept. 15, 2022), *aff'd sub nom.*, *In re Dissolution of Doehler Dry Ingredient Sols., LLC*, 294 A.3d 64 (Del. 2023) ("[Petitioner's] argument fails to identify any existing deadlock. Rather, it concerns *prospective* deadlock if the petitioner withholds future consent. This contrived attempt to manufacture deadlock cannot support a claim for judicial dissolution." (emphasis in original)).

[400] *Id.* at 59–60.

[401] Trial Tr. at 62:5–12 (Blanchard); JX-649 at 4.

[402] Northleaf's Post-Trial Opening Br. at 60 (citing *Seokoh*, 2021 WL 1197593, at *10 (finding deadlock justifying dissolution where managers were evenly divided over "the financing of the Company's operations and its dissolution")).

[403] Northleaf's Post-Trial Opening Br. at 61.

court's obligation to rescue Northleaf. Certainly, Northleaf's predicament does not justify the extreme relief of judicial dissolution.

## III. CONCLUSION

Judgment on all Counts is entered in favor of Defendants. The parties are ordered to submit a form of order or competing forms of order implementing this decision within ten business days.